Filed 4/28/22  P. v. Gomez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B305702 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA092080) |
| v. | |
| CESAR HECTOR GOMEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hayden A. Zacky, Judge.  Affirmed.

Thomas T. Ono for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

## INTRODUCTION

Defendant appeals his convictions for multiple sexual assaults against a single victim, a minor over the age of 14 years. The court sentenced defendant to four consecutive terms of life without the possibility of parole (LWOP). He argues his sentence was unauthorized because he was not provided with due process notice that he could be sentenced to LWOP. Defendant also asserts that the court prejudicially erred by admitting evidence of his sexual attack on another woman. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1.    *Defendant's Sexual Assault of Victim I.Q.*

On July 23, 2016, around 9:00 p.m., 16-year-old I.Q., the victim in the present case, was walking home alone, looking at her cell phone, and listening to music on her headphones when she passed defendant standing against a wall. Defendant grabbed I.Q. by the hair and asked her if she wanted to die. Defendant pressed an object wrapped in a green towel against her head; I.Q. thought it was a gun. Defendant covered I.Q.'s mouth and pushed her into the passenger seat of a car. Defendant climbed over her and got into the driver's seat. He then grabbed I.Q. by the hair, pulled her head down toward his lap, and drove away.

While driving, defendant called I.Q. "Anna." Anna was the name of defendant's ex-girlfriend. I.Q. told defendant her name was not Anna, and that he had the wrong girl. Defendant told I.Q. to "shut up," and he hit her in the head with what she thought was the gun. Defendant threatened to kill I.Q. if she did not comply with his demands.

Defendant drove for approximately a minute and then stopped. He instructed I.Q. to get undressed, and told her if she wanted to leave, she had to comply. I.Q. undressed. Defendant forced her to orally copulate him. After blindfolding her,

defendant inserted his fingers inside I.Q.'s vagina, and his penis in her vagina and anus. During the encounter, defendant called I.Q. names, like "baby girl."

Defendant then drove around and eventually stopped the car and pushed I.Q. out the door. I.Q. was naked and without her clothes or phone. She removed the shirt defendant had tied around her eyes and wore it. She eventually encountered two young women and used their phone to call for help. She cried uncontrollably as she spoke to police.

DNA recovered from I.Q.'s body by a forensic nurse matched defendant's DNA.[1] Following the DNA match, I.Q. identified defendant from a six-pack photographic lineup.

## 2. *Defendant's Subsequent Felony Assault with a Deadly Weapon on C.C.*

The prosecution introduced evidence of an unrelated assault defendant committed a year after his attack on I.Q. and before the DNA match. In the evening of August 29, 2017, 19-year-old C.C. encountered defendant while walking her dog. At the time, the streets were empty except for parked cars and a truck driving down the road. When C.C. turned at the intersection, the truck followed. The man in the truck asked for directions. After C.C. gave directions, the truck drove off but then returned to C.C.'s location and double parked. C.C. became concerned and walked away from the truck. The man exited the truck and walked toward her, holding a metal crowbar in his right hand. He said " 'hey, baby.' " C.C. screamed and ran away,

---

[1] There was a lag time of more than two years in locating and arresting defendant. The delay appears related to the absence of defendant's DNA in law enforcement's CODIS data bank at the time of his assault on I.Q. The DNA match was made in 2018.

but defendant continued to pursue her on foot.  At some point, defendant returned to his vehicle and drove away.

C.C. called the police.  While speaking to police near the scene, C.C. saw the same truck drive by and informed the officers.  Police pursued the truck and detained defendant, finding a crowbar in his possession.  C.C. confirmed the man in custody was the one who chased her.  At the trial for I.Q.'s sexual assault, defendant admitted that he was the man with the crowbar who followed C.C. that night, and that his conduct had resulted in a conviction for felony assault with a deadly weapon.

### 3.  *Police Interview of Defendant*

On January 2, 2019, police interviewed defendant, who denied that he knew I.Q., that she was ever in his car, or that he had had sex with her.  After the officers told defendant that his DNA was recovered from I.Q.'s rape kit, he again denied any contact with I.Q.  Toward the end of the interview, defendant started crying and said he had met I.Q.  Defendant said he stopped I.Q. and asked her to get into his car.  He stated they drove around the corner and had consensual sex.

### 4.  *Charges and Trial*

The information charged defendant as follows:

- Count 1:  forcible oral copulation in violation of Penal Code section 288a, subdivision (c)(2)(C); [2]
- Count 2:  forcible rape in violation of section 261, subdivision (a)(2);

---

[2]     All further undesignated statutory references are to the Penal Code.  Penal Code section 667.61 has been amended twice subsequent to the date defendant attacked I.Q.  Our citations to section 667.61 are to the version of the statute that was in effect from September 29, 2011 to December 31, 2018.  (Stats. 2010, ch. 219 (A.B. 1844), § 16, eff. Sept. 9, 2010; Stats. 2011, ch. 361 (S.B. 576), § 5, eff. Sept. 29, 2011.)

4

- Count 3: forcible sexual penetration by foreign object in violation of section 289, subdivision (a)(1)(C); and
- Count 4: sodomy by use of force in violation of 286, subdivision (c)(2)(C).

All counts alleged the single victim was a minor over 14 years old. For each count, the People alleged that, under section 667.61, subdivisions (a) and (d) defendant kidnapped the victim and that moving the victim increased the risk of harm to her. The information also alleged that defendant personally used a handgun in committing the offenses.

The case was tried in early 2020. Before opening statements, the parties discussed jury instructions, and the prosecutor informed defense counsel that the kidnapping allegation involving a minor above age 14 could result in LWOP sentences under section 667.61, subdivisions (*l*) and (m). Defense counsel stated he had discussed the LWOP sentence with defendant.

I.Q., C.C., I.Q.'s mother, law enforcement officers, and forensic scientists testified to the collective facts which we have described.

Defendant testified that I.Q. was a prostitute, with whom he had consensual sex a couple of months after his breakup with a woman named Anna. Defendant admitted he was previously convicted of felony assault with a deadly weapon on C.C. He stated that he thought C.C. was his ex-girlfriend Anna. He testified that he took the crowbar out, walked toward C.C. (thinking she was Anna), and then went back to his truck when he realized she was not Anna. He insisted he did not chase C.C. and said he did not know why he picked up the crowbar. Defendant attributed his behavior to intoxication—he had been drinking that day.

5

A jury convicted defendant as charged, except the jury found the personal gun use allegation not true.[3] The court sentenced defendant to four consecutive LWOP terms.

Defendant timely appealed.

### DISCUSSION

Defendant raises two issues on appeal. He asserts that the trial court could not lawfully sentence him to LWOP. And, he contends the court prejudicially erred in admitting evidence of his assault on C.C., which occurred significantly after the attack on I.Q. We address each issue in turn

**1.** ***Defendant Forfeited His Pleading Deficiency Due Process Argument***

Defendant argues that his four LWOP sentences violated his due process rights and were legally unauthorized because the information charging him with underlying crimes did not expressly allege an enhancement under section 667.61, subdivision (*l*). The information did allege enhancements under section 667.61 (a) and (d), but it is subdivision (*l*) that makes the four charged crimes punishable by LWOP.[4]

---

[3] The gun enhancement was presumably based on I.Q.'s statement that defendant had hit her on the head with what she thought was a gun. The prosecution did not offer any other evidence of gun use.

[4] The information is structured, in part, as a chart with six headings. Under the heading "Allegation," for each count the information states: "PC 667.61(a)/(d)," which we understand to mean Penal Code section 667.61, subdivisions (a) and (d). Under a separate heading entitled "Alleg. Effect," for each count the information states, "25 to Life State Prison +10 Yrs." We understand "Alleg." to mean "Allegation's." The information does not explicitly mention either LWOP or life without the possibility of parole.

Defendant admits that at sentencing he did not object to this pleading defect. This was not a situation where an objection was only technically deficient or reasonably overlooked in the stress of trial. Defendant had ample opportunities to object to the pleading deficiency. After voir dire and with defense counsel present, the prosecutor told the court that, she had researched the jury instructions for section 667.61, subdivision (*l*), and informed defense counsel that the aggravated kidnapping enhancement involving a minor above age 14 could result in LWOP sentences. The following exchange took place:

"[Prosecutor]: I did let [defense counsel] know when I was researching the issue of jury instructions, I noticed that under 667.61 – I believe it's either subdivision (m) or (*l*) or (i). Something to that effect – that if certain charges – if a defendant is guilty of certain charges, like in this case, rape, and the jury finds true one of the subsection (d) or (e) allegations, that can change the sentencing structure.

"So let's say, for example, the aggravated kidnapping charge that the People alleged would normally be a 25 to life crime. But given the fact that the named victim is a minor above the age of 14, that becomes an L.W.O.P. crime. So that was my reading of the code section. So I let [defense counsel] know that.

"The Court: All right.

"[Defense Counsel]: And I have discussed that with Mr. Gomez.

"The Court: What [the prosecutor] is referencing is listed in subdivisions (*l*) and (m) under 667.61. I will research that as well."

7

The parties then gave their opening statements.

After the jury found defendant guilty on all four counts and all four aggravated kidnapping enhancements, the prosecution filed its sentencing memorandum asserting the court should sentence defendant to LWOP for each count under section 667.61, subdivision (l), to be served consecutively under section 667.6 subdivisions (c), (d), and (e). At sentencing, the court imposed four consecutive LWOP sentences. Even though defendant and his counsel were aware of the pleading deficiencies and that the People were seeking LWOP sentences, the defense made no objection either to the sentencing memorandum or at the sentencing hearing.

Defendant nonetheless asserts that "his due process claim is not forfeited because the resulting sentence was unauthorized." Citing *People v. Mancebo* (2002) 27 Cal.4th 735, 749, fn. 7 (*Mancebo*), defendant asserts the "waiver rule is inapplicable where an unauthorized sentence occurs when a court violates mandatory provisions governing the length of confinement." Yet, defendant does not argue that mandatory provisions governing the length of his confinement were violated. Rather, he asserts the pleading was insufficient to place him on notice of the LWOP sentences.[5]

In *People v. Anderson* (2020) 9 Cal.5th 946, 962 (*Anderson*), which defendant also cites, the Supreme Court explained that "*Mancebo* does not stand for the broad proposition that imposition of an unpleaded enhancement necessarily results in an unauthorized sentence that may be raised, and corrected, for

---

[5] In *Mancebo*, the Supreme Court held that a trial court could not at the time of sentencing substitute an unpled multiple victim enhancement for a properly pled gun use enhancement. (*Mancebo, supra*, 27 Cal.4th at p. 739.)

the first time on appeal." (*Anderson, supra*, 9 Cal.5th at p. 962.) "The unauthorized sentence doctrine is designed to provide relief from forfeiture for 'obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings.' [Citation.] It applies when the trial court has imposed a sentence that 'could not lawfully be imposed under any circumstance in the particular case.' [Citation.] Take, for example, a sentence in excess of the statutory maximum. An appellate court would be required to correct such an error even if raised for the first time on appeal, since such a correction would require no fact-specific inquiry and the sentence would be unlawful under any circumstances." (*Anderson, supra*, 9 Cal.5th at p. 962.)

The *Anderson* court cited its earlier opinion in *People v. Houston* (2012) 54 Cal.4th 1186, 1227 (*Houston*), as "effectively reject[ing] the notion that a pleading defect necessarily results in an unauthorized sentence." (*Anderson, supra*, 9 Cal.5th at p. 962.) In *Houston*, the defendant argued he was improperly sentenced to life imprisonment for attempted murders because the indictment did not allege that the attempted murders were willful, deliberate, and premeditated, as required by the Penal Code. (*Houston, supra*, 54 Cal.4th at p. 1225.) During the defense presentation at trial, the court informed the defendant that if convicted, he would be sentenced to life imprisonment on the attempted murder counts. The court also asked the parties if they had objections to instructions and verdict forms directing the jury to determine whether the attempted murders were willful, deliberate, and premeditated. (*Id.* at p. 1227.) The defense did not object.

The *Houston* court concluded that the defendant's silence at these junctures resulted in forfeiture: "Had defendant raised a timely objection to the jury instructions and verdict forms at any

of these stages of the trial on the ground that the indictment did not allege that the attempted murders were deliberate and premeditated, the court could have heard arguments on whether to permit the prosecutor to amend the indictment. (See § 1009 [trial court may permit amendment of an indictment at any stage of the proceedings].) If the trial court was inclined to permit amendment, defendant could have requested a continuance to permit him to prepare a defense. [Citations.] On the facts here, defendant received adequate notice of the sentence he faced, and the jury made an express finding that the attempted murders were willful, deliberate, and premeditated. A timely objection to the adequacy of the indictment would have provided an opportunity to craft an appropriate remedy. Because defendant had notice of the sentence he faced and did not raise an objection in the trial court, he has forfeited this claim on appeal." (*Houston, supra*, 54 Cal.4th at pp. 1227–1228.)

As in *Houston*, defendant had sufficient notice of the LWOP sentences, repeated opportunities to object, and plenty of time to adjust his defense in anticipation of that potential sentence. Defendant has forfeited his argument on appeal.

**2.** ***Any Error in Admitting Defendant's Assault on C.C. was Harmless***

Relying on Evidence Code sections 1108 and 352, defendant argues the court erred in admitting evidence of his assault on C.C. [6] "The trial court's ruling admitting evidence under these provisions is reviewed for an abuse of discretion." (*People v. Erskine* (2019) 7 Cal.5th 279, 296.)

---

[6] From this point in our opinion to its conclusion, when we use "section" we are referring to the Evidence Code.

10

### a. Relevant Proceedings

Prior to trial, the court heard argument on the prosecution's motion to introduce C.C.'s testimony pursuant to sections 1108 and 352. Section 1108, subdivision (a) provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [s]ection 1101, if the evidence is not inadmissible pursuant to [s]ection 352." Section 352 states the familiar rule that allows the trial court to exclude otherwise admissible evidence if its probative value is substantially outweighed by the probability of undue prejudice.

The People argued before the trial court that the uncharged evidence was sexual in nature because defendant followed C.C. closely for a period of time and when defendant exited the vehicle, he called her "baby." (In the attack on I.Q, defendant called I.Q. names, like "baby girl.") C.C. told police she believed defendant was going to kidnap and rape her. The prosecutor stated the incident was very similar to the instant case: Defendant used a gun or something similar, and he approached a young female who was walking alone late in the evening. The incidents occurred less than three miles apart.

Defense counsel countered that the C.C. assault was not sexual in nature, and to claim otherwise would be speculative. Its introduction would be very prejudicial.

The trial court admitted the evidence. The court provided its reasoning on the record, citing *People v. Falsetta* (1999) 21 Cal.4th 903 and listing the various factors to be considered in conducting section 352 analysis. The court stated the victims were similar in age, the locations were less than three miles apart, a vehicle and a weapon were used in each incident, both occurred under the cover of darkness, and the incidents took place less than a year apart. The court indicated defendant's

11

language could indicate sexual intent, and found that the assault on C.C. was less inflammatory than the attack on I.Q.

b. *Applicable Law*

Evidence of other crimes or bad acts is generally inadmissible when offered to show a defendant had a criminal disposition or propensity to commit the crime charged. (Evid. Code, § 1101, subd. (a); *People v. Robertson* (2012) 208 Cal.App.4th 965, 989.) Section 1108, subdivision (a) creates an exception to this rule for sex crimes.

The evidence may not be admitted if it violates section 352. "Under section 352, exclusion of evidence is permissible only if its probative value is 'substantially outweighed' by the 'probability' that its admission will create a 'substantial' danger of 'undue' prejudice." (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)

On appeal, admission of evidence under section 1108 is subject to harmless error review. (*People v. Mullens* (2004) 119 Cal.App.4th 648, 658–659 [applying *People v. Watson* (1956) 46 Cal.2d 818, standard to Evid. Code, § 1108 error].) Under *Watson*, when assessing harmless error, we determine whether it is reasonably probable that its exclusion would have led to a different result. (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

c. *Any Error Was Harmless*

Even if we were to assume that admitting the evidence of defendant's assault on C.C. was error – a conclusion which we do not reach – any error was harmless because evidence of defendant's guilt was overwhelming. I.Q. testified that defendant forced her into his car and forcibly committed sex acts against her. Eye witnesses described I.Q.'s extremely emotional and distraught state immediately following her encounter with defendant. I.Q. identified defendant from a six-pack photographic lineup, and police recovered defendant's DNA from I.Q.'s body.

Defendant also admitted that he picked up I.Q. and had sexual intercourse with her.  His explanation that I.Q. was a prostitute and that she willingly had sex with him was contrary to all the other direct and circumstantial evidence.  It is not reasonably probable that excluding evidence of defendant's assault on C.C. would have led to a different result.

### DISPOSITION

The judgment is affirmed.




                                        RUBIN, P.J.

WE CONCUR:



                    BAKER, J.



                    MOOR, J.